# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

EMMIE JONES, as Parent and     )
Guardian of MJ, a minor,     )
    )
    Plaintiff,     )
    )   Docket no. 2:11-cv-437-GZS
v.     )
    )
FAIRBANK RECONSTRUCTION     )
CORP.,     )
    )
    )
    Defendant.     )

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Fairbank Reconstruction Corp.'s Motion for Summary Judgment (ECF No. 58) by which Fairbank Reconstruction Corp. ("Fairbank") seeks summary judgment on its cross claims against Defendant Greater Omaha Packing Company ("GOPAC"). After the pending Motion for Summary Judgment was briefed and placed under advisement, GOPAC sought leave to file a supplemental brief, which the Court granted on May 31, 2013 (ECF No. 92). As a result, the Court received supplemental briefs and statements of material fact from both Fairbank & GOPAC (ECF Nos. 94-97). As explained herein, the Court now GRANTS IN PART and DENIES IN PART the Motion.

## I.    LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law."  Nereida–Gonzalez v. Tirado–Delgado, 990 F.2d 701, 703 (1st Cir. 1993) (citing Anderson, 477 U.S. at 248) (additional citation omitted).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); see also Fed. R. Civ. P. 56(e).  "Mere allegations, or conjecture unsupported in the record, are insufficient."  Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera–Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation.") (citations omitted). "[A]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (quoting In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993)).

## II.    PROCEDURAL HISTORY

For the unfamiliar reader, a useful starting point for understanding the pending dispute between Co-Defendants Fairbank and GOPAC is the prior cases of Long v. Fairbank Reconstruction Corp., D. Me Docket #1:09-cv-592-GZS and Smith v. Fairbank Reconstruction Corp., D. Me. Docket #2:10-cv-60-GZS.  This prior litigation was aptly summarized by the First Circuit, as follows:

> GOPAC is a beef slaughtering and processing company, located in Omaha, Nebraska, that ships millions of pounds of beef each day to other meat processors throughout the country. One of GOPAC's products, known as a "combo," is a container filled with two thousand pounds of meat and fat. Fairbank, a meat processing company, purchases combos from GOPAC and other suppliers; it then grinds and packages the combo meat and fat into retail-size packages of ground beef.

> In the fall of 2009, thirty-two people in the northeastern United States were sickened by an outbreak of E. coli. The infections were traced to Fairbank's Ashville, New York facility, which ultimately had to recall approximately 500,000 pounds of ground beef. Two of the people infected in the outbreak, Margaret Long and Alice Smith, had purchased retail packages of ground beef from Shaw's supermarkets in Maine. They each sued Fairbank in federal court in Maine, seeking compensation for their medical expenses and other damages. Fairbank then filed third-party complaints against GOPAC in each suit, alleging that GOPAC had supplied Fairbank with the tainted meat that ended up in the packages Long and Smith had purchased. Fairbank sought indemnification from GOPAC, under common law and contractual theories, in the event Fairbank was found liable to the individual plaintiffs.

> Fairbank later settled Long's and Smith's claims for $100,000 and $400,000, respectively. Long and Smith both dismissed their complaints in March 2011, leaving only the third-party complaints by Fairbank against GOPAC. The district court consolidated those complaints into one case in August 2011, and the parties proceeded to a jury trial [in November 2011].

Long v. Fairbank Reconstruction Corp., 701 F.3d 1, 2-3 (1st Cir. 2012) (footnote omitted).[1]

---

[1] For purposes of this Order, the Court refers to these earlier consolidated proceedings as the "Long/Smith trial" although the only two parties participating in the trial were Fairbank and GOPAC.

The *Long/Smith* case was ultimately submitted to the jury with a special verdict form on Fairbank's claim that GOPAC breached an express warranty contained in the Fairbank Guarantee.  The jury responded "YES" to each of the following questions:

1.    Do you find that GOPAC delivered adulterated raw beef containing *E. coli* O157:H7 to Fairbank in September 2009?

2.    Do you find that Fairbank acted as a reasonable buyer in using the adulterated raw beef delivered by GOPAC in September 2009?

3.    Do you find that this same adulterated raw beef, which was ground by Fairbank, was later consumed by Long causing her injuries and resulting in her receipt of a settlement of $100,000?

4.    Do you find that this same adulterated raw beef, which was ground by Fairbank, was later consumed by Smith causing her injuries and resulting in her receipt of a settlement of $400,000?

(See Special Verdict Form in D. Me. Docket No. 1:09-cv-592-GZS (ECF No. 58-2).)  GOPAC filed post-trial motions and an appeal of this verdict.  However, the First Circuit affirmed the judgment on November 21, 2012 and issued its mandate on December 26, 2012.  See generally Long v. Fairbank Reconstruction Corp., 701 F.3d 1 (1st Cir. 2012).

On November 14, 2011, shortly after the verdict in the *Long/Smith* trial, Plaintiff Emmie Jones filed the current case alleging her child, M.J., suffered damages as a result of consuming adulterated ground beef in September 2009.  Essentially, Plaintiff claims M.J. was a victim of the same 2009 *E. coli* O157:H7 outbreak that sickened Long and Smith.  Unlike Long and Smith who sued only Fairbank, Jones names both Fairbank and GOPAC as Defendants resulting in the cross-claims at issue in the pending motion.

### III.   FACTUAL BACKGROUND

Having reviewed the statements of material fact and supporting exhibits in accordance with Local Rule 56, the Court constructs the following narrative from the undisputed facts as well as the disputed material facts viewed in the light most favorable to the non-movant, in this case, GOPAC.[2]

Emmie Jones purchased case ready Shaw's 85/15 ground beef product on September 21, 2009 from the Shaw's located in Auburn, Maine.  (SMF ¶10 & ECF No. 58-8.)  Jones' five-year-old son, M.J., became sick on September 28, 2009.  He was ultimately admitted to the hospital and stool cultures determined that he was infected with *E. coli* O157:H7.  (See Maine DHHS Investigation File for M.J. (ECF No. 58-13).)  During October 2009 interviews conducted by state health officials investigating M.J.'s illness, Emmie Jones reported that her family had consumed meat loaf made with the purchased Shaw's ground beef and she no longer had any ground beef in her home.  (Id.) She also reported that M.J. had consumed shepard's pie prepared by his grandmother.[3]  (Id.)

---

[2] This factual narrative is drawn from the following statements of material fact and the documents cited therein: Fairbank's Statement of Material Facts (ECF No. 59) ("SMF"); GOPAC's Response to SMF & Add'l Statement of Material Facts (ECF No. 63) ("Add'l SMF"); Fairbank's Response to GOPAC's Statement of Add'l Facts (ECF No. 65) ("Add'l SMF Response"); GOPAC's Supplemental Statement of Material Facts (ECF No. 95) ("Supp. SMF"); and Fairbank's Opp. to Supp. SMF (ECF No. 97) ("Supp. SMF Response").  The Court notes to the extent that any asserted fact was not admitted, the Court has construed any qualified fact by reviewing the cited documents.  The Court has disregarded many statements, qualifications and denials that cite only to representations made by attorneys in briefs, letters or affidavits.  With the possible exception of procedural history, citations to statements by counsel do not provide the Court with evidence of material facts because statements by lawyers are not evidence that would be admissible at a trial.  See, e.g., infra note 3 (discussing affidavit of Attorney Osterholm).

[3] The only records with respect to what ground beef products were served to M.J. in the days and weeks prior to his illness consists of the Maine DHHS Investigative File (ECF No. 58-13) and an Affidavit of Ryan Osterholm (ECF No. 58-12), who is Plaintiff's counsel.  With respect to the key issue in this case—what, if any, beef M.J. ate prior to becoming ill on September 28, 2009—these records contain multiple levels of hearsay.  By way of example, the only direct evidence that five-year-old M.J. ate his mother's meatloaf prepared between September 21, 2009 and September 28, 2009 is the statement contained in the Affidavit of Attorney Ryan Osterholm.  (See Osterholm Aff. ¶7.)  In short, the summary judgment record does not provide an adequate evidentiary basis upon which the Court could conclude that M.J.'s only relevant beef exposure was Shaw's case ready ground beef, which would be the first step in establishing undisputed causation in this case.

Investigation by federal and state authorities in October 2009 tied an increased number of *E. coli* O157:H7 infections, including M.J.'s infection, to exposure to ground beef produced by Fairbank.[4]  This investigation included pulsed-field gel electrophoresis (PFGE) testing and multiple loci VNTR analysis (MLVA) of cultures taken from multiple sick individuals, including M.J., Long and Smith.  (See Compl. (ECF No. 1) ¶¶11-12; GOPAC Answer (ECF No. 7) ¶¶11-12; SMF ¶14.)  These test results were used by health officials to conclude that the individuals tested were all sickened as part of what came to be known as the "2009 Northeast Outbreak."  A chart produced as part of the USDA investigation of the 2009 Northeast Outbreak included the Jones' purchase as one of twelve ground beef purchases used to trace the Northeast Outbreak back to Fairbank's Ashville facility.  Margaret Long was included on this same trace-back chart.[5] (SMF ¶11 & ECF No. 58-9 at Page ID 703.)  Ultimately, on October 31, 2009, USDA Food Safety and Inspection Service announced a recall of Fairbank's ground beef products, this recall covered products Fairbank had produced between September 14, 2009 and September 16, 2009, which the USDA believed to be the source of the 2009 Northeast Outbreak.  (See Compl. ¶¶16-17; GOPAC Answer ¶¶ 16-17.)

Since that recall, multiple individuals sickened as part of the 2009 Northeast Outbreak have sought damages from Fairbank.  Fairbank, in turn, has sought indemnification from GOPAC, as a supplier, under the terms of their express contract, which includes the Fairbank Guarantee. (SMF ¶¶1 & 2; ECF No. 58-3.)  The Fairbank Guarantee requires GOPAC to indemnify Fairbank from "all claims, damages, causes of action, suits, proceedings, judgments, charges, losses, costs, liability and expenses (including attorneys' fees) arising from any products

---

[4] This 2009 investigation did not attempt to trace the *E. coli* O157:H7 back beyond Fairbank.  Thus, the governmental investigation included no finding that GOPAC or any other Fairbank supplier was the definitive source of the *E. coli* O157:H7 contamination.  (See, e.g., GOPAC Response (ECF No. 62) at 10.)

[5] This chart was introduced at the *Long/Smith* trial as part of Exhibit 129.  (See *Long/Smith* Trial Tr. at 414-14.)

(raw materials)" that GOPAC delivered to Fairbank that did not meet Fairbank's specifications. (SMF ¶3 & ECF No. 58-3.)   These specifications include a requirement that the products delivered to Fairbank be not adulterated as defined in the Meat, Poultry and Inspection Act, including being free from adulteration with *E. coli* O157:H7.

GOPAC has disputed both that it breached the Fairbank Guarantee and that any GOPAC breach is the cause of any costs or damages Fairbank incurred as a result of the 2009 Northeast Outbreak.   This dispute was first tried in the *Long/Smith* case.   It was also litigated before the District of New Hampshire in a case titled: *Precourt v. Fairbank Reconstruction Corp.*, 1:10-cv-337-LM (D.N.H.).   The factual record developed in these two cases serves as the foundation for the additional factual development that has occurred in this case.

### A.  The First Case to Go to Trial: *Long/Smith* Cases

By the time of the *Long/Smith* trial in November 2011, Fairbank and GOPAC both agreed that Long and Smith had suffered damages as a result of *E. coli* O157:H7 and that both women had contracted *E. coli* O157:H7 from ground beef produced by Fairbank.  (SMF ¶8.)  At trial, the evidence presented showed that Smith spent $5.83 to purchase case ready 85/15 ground beef product from a Shaw's in Portland, Maine (a/k/a Shaw's Westgate) on September 23, 2009. Long spent $2.31 to purchase case ready 85/15 ground beef product from a Shaw's in Augusta, Maine on September 19, 2009.  (*Long/Smith* Trial Tr. at 680-81, 686 & 691; Supp. SMF ¶16; Supp. SMF Response ¶21.)  During this 2009 time period, Shaw's case ready 85/15 ground beef product was produced by Fairbank at its Ashville facility.

The undisputed testimony at the *Long/Smith* trial was that Fairbank delivered case ready ground beef to a Shaw's distribution center in Methuen, Massachusetts.  Shaw's then "cross docked" the product so that it is sent it out to various stores "that day."  (Add'l SMF ¶¶ 24-25;

*Long/Smith* Trial Tr. at 591.)  Fairbank assigned product code 30085 to one-pound packages of 85/15 ground beef that were shipped to Shaw's Methuen distribution center.  (Add'l SMF ¶33.)

Much of the focus of the trace-back evidence at the *Long/Smith* trial eventually focused on Shipping Invoice No. 30243 and its accompanying Load Plan Checklist, which was introduced into evidence at the *Long/Smith* Trial as Exhibit 142. (Add'l SMF ¶39.)  Shipping Invoice No. 30243 reflects the shipment of 1,200 cases of product code 30085 85/15 ground beef from Fairbank's Ashville facility to Shaw's Methuen Distribution facility.  (Fairbank Shipping Invoice 30243 (ECF No. 63-14).).  This product was received at the Methuen distribution center on September 18, 2009. (Id.)   Additionally, Fairbank introduced Shipping Invoice 30245 as Exhibit 143.  Invoice 30245 shows that on September 18, 2009, Fairbank delivered 1,200 cases of product code 30086 85/15 ground beef (case ready two pound packages) to Shaw's Methuen Distribution center.[6]  (See Supp. SMF ¶2 & ECF No. 95-2.)

Fairbank's shipping invoices are accompanied by weight manifests.  (Add'l SMF ¶52.) Weight manifests provide the serial numbers for the products contained on a shipment.  (Add'l SMF ¶53.)  The Weight Manifest for Shipping Invoice No. 30243 lists the serial numbers for all 1,200 boxes of 30085 product shipped to Shaw's central distribution in Methuen, MA. (Add'l SMF ¶54.).  The Weight Manifest for Invoice No. 30243 reveals that the first serial number greater than serial no. 66462425 (the earliest product made on September 16, 2009) is serial no. 66467160.[7]  (Add'l SMF ¶66 & Add'l SMF Response ¶59.)  Serial no. 66467160 was made on

---

[6] During the appeal of the *Long/Smith* case, Fairbank's counsel indicates that Shipping Invoice 30245 maintained the connection between contaminated Fairbank meat and Smith, who at that time was thought to have possibly purchased a two-pound package of ground beef because of the purchase price ($5.83). (Supp. SMF ¶3.)

[7] Based on a Fairbank quality control mechanism known as "case verification code," GOPAC attempts to tie specific serial numbers to precise times during the production day.  Notably, Fairbank uses several systems to assign serial numbers to products that are produced simultaneously on different production lines.  As a result the serial numbers are not necessarily chronological.  (Add'l SMF Response ¶57.)  Nonetheless, the Court acknowledges that the following facts have been admitted for purposes of the pending motion:  (1) The first Case Code Verification for

8

September 16, 2009 after 1:42 p.m. (Add'l SMF ¶¶67 & 68.)[8]  Ultimately, the Weight Manifest

for Shipping Invoice No. 30243 contained serial numbers for product Fairbank produced on both

September 15, 2009 and September 16, 2009. (Add'l SMF ¶¶42 & 55.)  Thus, much of the trace-

back evidence at the *Long/Smith* trial necessarily focused on what raw materials went into

Fairbank's product code 30085 production on these dates that was subsequently shipped under

Invoice 30243.

At the *Long/Smith* trial, GOPAC disputed that the ground beef shipped under Invoice

30243 in fact contained GOPAC 50/50 sirloin trim produced on September 11, 2009.  GOPAC

sought to establish that product from another supplier, BPI, was in fact used in every implicated

batch of Fairbank ground beef.  (Add'l SMF ¶¶18 & 44.)  However, the record at the *Long/Smith*

trial reflected that different BPI products were used in the relevant batches of Fairbank's ground

beef production.  (Add'l SMF Response ¶44.)

Fairbank, on the other hand, produced multiple witnesses who tied the 2009 Northeast

Outbreak to GOPAC 50/50 sirloin trim.  Tim Biela, a Fairbank executive, testified that Fairbank

had received five combo bins of raw 50-50 sirloin from GOPAC on September 13, 2009, which

GOPAC had produced on September 11, 2009. (Add'l SMF ¶31.)  Fairbank's expert Alan

Melnick opined that the contaminated raw beef trim that sickened Long and Smith was GOPAC

50-50 sirloin. (Add'l SMF ¶30.)  Melnick also testified that 50/50 sirloin trim was the only

---

September 16, 2009 is at 06:58 a.m. and has serial no. 66462425.  (Add'l SMF ¶58.); (2) The Case Code Verification taken at "pack time" 12:36 indicates that Fairbank was running at serial no. 66465440. (Add'l SMF ¶63.); (3) The Case Code Verification taken at "pack time" 14:12 indicates that Fairbank was running at serial no. 66466572.  (Add'l SMF ¶64.)

[8] The Court deems paragraphs 47 & 68 of GOPAC's Additional Statement of Material Facts admitted because Fairbank supported its initial denials, see Add'l SMF Response ¶¶ 47 & 68, with a citation that it has since withdrawn.  (See Fairbank's Opp. to GOPAC's Mot. for Leave to Sur-Reply (ECF No. 67) at 1 (withdrawing Fahle Ex. A (ECF No. 64-2).)

common raw material used in the products implicated in the 2009 Northeast Outbreak.  (Supp. SMF ¶1.)

A chart made by USDA Food Safety Inspection Service investigator, Dr. Deborah Lutz reflected earlier trace-back work done during the government investigation of the 2009 Northeast Outbreak.  This chart was marked as part of Exhibit 131 at the *Long/Smith* trial.  (Suppl. SMF ¶5. & ECF No. 95-4 at Page ID# 2553.)  The chart focuses on Fairbank products processed between noon on September 14, 2009 and 1:10 pm on September 16, 2009 and lists serial numbers 324432, 324433 and 324438.[9]  As explained at the *Long/Smith* trial, these serial numbers reflect numbers Fairbank applied to each combo bin of raw material received at its Ashville facility and the serial numbers "track raw material . . . and when those raw materials were used in the production."  (*Long/Smith* Trial Tr. 432.)  The three listed serial numbers were assigned to GOPAC combo bins.  (Suppl. SMF ¶10.)  As reflected on *Long/Smith* Exhibit 131, Dr. Lutz listed no other raw materials other than GOPAC combos with the relevant serial numbers as part of the 2009 USDA trace-back of the Northeast Outbreak.  (Suppl. SMF ¶¶6 & 11.)  Given the production times listed on this Lutz chart, GOPAC sought to establish that product shipped on Invoice 30243 was made outside those production windows and/or was not made with GOPAC sirloin trim.

By way of example, GOPAC points to Fairbank's lab audit sheets, which reflect information randomly gathered as part of Fairbank's quality control program.  A Fairbank lab audit sheet for September 16, 2009 shows that Fairbank produced 30085 product using batch C5

---

[9] This same chart lists these serial numbers and many other serial numbers under the "chub" category.  Fairbank's "chub" product was not at issue in *Long/Smith* and is not at issue in Jones since Shaw's only purchases "retail" case ready product from Fairbank.  (*Long/Smith* Trial Tr. at 433.)  However, ten pound chubs that were sold to Price Chopper for regrinding and repackaging at the store were implicated in the Northeast Outbreak and part of the government trace-back investigation.

during the 13:00 hour.  (Add'l SMF ¶¶ 46-48.)[10]  This is the only 30085 product reflected on the sheet as being produced during the 7:46 a.m.-1:42 p.m. period on September 16, 2009.  (Id.) Fairbank's retail formulation sheets identify which suppliers' products were used in batch C5. (Add'l SMF ¶49.)  The Fairbank retail formulation sheet for September 16, 2009, indicates that batch C5 was a batch weighing 6,755 pounds and included product from six different suppliers. (Add'l SMF ¶50.)  Only 264 pounds of the total amount of batch C5 was GOPAC 50-50 sirloin, which constituted just 4% of the entire batch.  (Add'l SMF ¶51.)

Ultimately, the jury was not swayed by GOPAC's attempts to counter the trace-back evidence presented by Fairbank.  Rather, based on the entirety of the trial record, which also included genetic evidence and the epidemiological evidence, the jury concluded the preponderance of the evidence showed that the ground beef purchased and consumed by Smith and Long contained adulterated beef trim produced by GOPAC on September 11, 2009.  (SMF ¶¶5-7,17 & 18.)

**B.  The New Hampshire Case:  Precourt**

Another apparent victim of the 2009 Northeast Outbreak was Carolyn Black, who purchased ground beef from Shaw's in Seabrook, New Hampshire on September 24, 2009. Black was admitted to the hospital on October 4, 2009 and subsequently died on October 30, 2009 as a result of injuries sustained as a result of her exposure to *E. coli* O157:H7.  See Precourt v. Fairbank Reconstruction Corp., 856 F. Supp. 2d 327, 331 (D.N.H. 2012).  Lori Precourt, as the administrator of the estate of her mother, filed a case in federal district court in New Hampshire, *Precourt v. Fairbank Reconstruction Corp.*, D.N.H. Docket # 1:10-cv-337-LM (hereinafter

---

[10] The Court notes that this information was included as part of Plaintiff Exhibit 1 at the *Long/Smith* trial.

"*Precourt*"), naming Fairbank, GOPAC, and Shaw's[11] as defendants.  See id. at 330.  The law firm of Gass Weber represented both Fairbank and Shaw's.  (Add'l SMF ¶23.)  On December 21, 2011, following the conclusion of the *Long/Smith* trial, Shaw's produced some documentation regarding shipments from its Methuen distribution center to its grocery stores.  (Add'l SMF ¶24 & ECF No. 63-9)  The Shaw's documentation includes information regarding how much of a particular product was shipped to a particular Shaw's store on a particular day but it does not identify particular packages received from Fairbank Farms.  (Id.)  Nonetheless, based on this post-*Long/Smith* trial production, GOPAC now asserts that it has new evidence to prove that one of the patients listed on the Lutz wheel chart could not have purchased ground beef off of Shipping Invoice 30243.  Rather, GOPAC would assert based on Shaw's records that the Enfield, Connecticut store did not receive any product code 30085 ground beef that was shipped on Shipping Invoice 30243.[12]  (Add'l SMF ¶¶27-29.)

### C.  The Current Case: Jones

Building on discovery obtained in prior cases and with the benefit of many of the initial legal questions resolved, GOPAC has continued to press Fairbank for additional discovery in the pending case.  As a result of these efforts, Fairbank for the first time produced stand-alone electronic scale data on May 7, 2013.  (Supp. SMF ¶14 & Supp. SMF Response ¶14.)  Fairbank's stand-alone scale data provides date, item #, description, weight, and time ("scale data").  (Suppl. SMF ¶17.)  Fairbank's Weight Manifest for Invoice 30243 coupled with Fairbank's recently produced scale data establishes that Invoice 30243 contained no production from September 16, 2009, made before 3:00 p.m.  (Suppl. SMF ¶8.)

---

[11] Shaw's was not a party to the *Long/Smith* cases and it is not a party to the instant *Jones* action. (Add'l SMF ¶21.)

[12] The *Precourt* case was ultimately settled before trial in March 2012 with a stipulation of dismissal filed on May 17, 2012.  See *Precourt* D.N.H. Docket # 1:10-cv-337-LM at ECF Nos. 167 & 169.

Additionally, GOPAC now has obtained evidence that calls into question the trace-back conducted on Smith's ground beef purchase.  On February 21, 2013, GOPAC first deposed a representative of Shaw's, Edward Rodericks, who testified that on September 19 and 20 of 2009, Shaw's was selling ground beef for a promotional price of $1.88 per pound.  (See Rodericks Dep. (ECF No 97-7) at 148.)  If this promotional price were applied to the purchases by Smith, it would appear that she purchased a three pound package of case ready ground beef from Shaw's in Portland during her September 23, 2009 visit.  If Smith purchased a three pound package of ground beef, it was not shipped under Shipping Invoice 30243 (which contained only one pound packages) or Shipping Invoice 30245 (which contained only two pound packages).

Moreover, having conducted further review in response to the discovery requests and disputes in the pending case, Fairbank now admits that product shipped under Invoice 30243 contained GOPAC *chuck* trim, which Fairbank also claims GOPAC produced on September 11, 2009.[13]  (Supp. SMF ¶12 & Supp. SMF Response ¶12.)

## IV.    DISCUSSION

Fairbank initially pled four cross-claims against GOPAC: (1) Breach of Contract, (2) Contractual Indemnity, (3) Contribution and Indemnity on Plaintiff's Strict Liability Claim (pled in the alternative), (4) Contribution and Indemnity on Plaintiff's Breach of Warranty Claims (pled in the alternative), (5) Contribution and Indemnity on Plaintiff's Negligence Claim (pled in the alternative).  (See Fairbank Ans. & Cross-Claims (ECF No. 18) at 28-34.)  Those cross-claims were subsequently limited as a result of the Court granting GOPAC's Partial Motion to

---

[13] In its supplemental submissions, Fairbank claims that GOPAC chuck trim was used in batch C6, which was made immediately following batch C5.  Fairbank now asserts batch C5 contained the adulterated GOPAC sirloin trim. (See Supp. SMF Response ¶¶6 & 13.)

Dismiss on September 11, 2012. (See Order on Partial Motion to Dismiss Cross-Claims (ECF No. 55). As a result of that Order, Fairbank's Count I Cross-Claim was dismissed without prejudice and the Count II Cross-Claim was limited to "contractual indemnity for any amounts related to Plaintiff's claims." (Id. at 10-11.) In its pending Motion for Summary Judgment, Fairbank now argues it is entitled to summary judgment on this remaining contractual indemnification claim based on the outcome of the *Long/Smith* trial and the available undisputed evidence linking M.J.'s *E. coli* O157-H7 to other 2009 Northeast Outbreak cases, including Long and Smith.[14]

### A. Collateral Estoppel

Turning first to Fairbank's collateral estoppel argument, GOPAC certainly anticipated that the verdict in the *Long/Smith* trial would likely result in some amount of issue preclusion. (See *Long/Smith* Tr. Transcript at 1320 (Counsel for GOPAC indicating that "issue preclusion" is "the gorilla in this room" during a conference on the proposed verdict form).[15] Thus, the question is really to what extent does offensive collateral estoppel apply? See, e.g., Acevedo–Garcia v. Monroig, 351 F.3d 547, 573 (1st Cir. 2003) ("[W]here . . . plaintiffs seek to use issue preclusion to tie the defendants' hands with an adversely decided issue from a previous case, the use of collateral estoppel is deemed 'offensive'.") In other words, which legal rulings and portions of the special verdict rendered at the *Long/Smith* trial foreclose GOPAC from re-

---

[14] To the extent GOPAC initially opposed Fairbank's summary judgment motion pursuant to Rule 56(d) claiming additional discovery was required, the Court notes that GOPAC has had ample time to complete additional discovery. In fact, the deadline for completion of fact discovery was February 12, 2013. Based on the Court's review of the docket, even in the absence of any court-approved extension of that deadline, it appears the parties continued to engage in fact discovery after the February deadline. (See, e.g., Reports of Hearing & Orders (ECF Nos. 80 & 86); 7/16/2013 Dep. of Timothy Biela (ECF Nos. 100-1) at 5 (counsel acknowledging 2/12/2013 discovery deadline but indicating that electronic data was produced after that deadline).) In any event, it does appear that factual discovery in this case is now closed and the Court has allowed supplemental briefing to reflect that closing. Therefore, the Court deems GOPAC's Rule 56(d) request MOOT.

[15] In fact, GOPAC proposed a different verdict form and the Court refused to adopt GOPAC's proposed form. (See *Long/Smith* Trial Tr.at 1329 & 1407; GOPAC's Proposed Verdict Form (ECF No. 393-5 in D. Me. Docket # 1:09-cv-592-GZS).)

litigating issues raised in the similar cross-claims in the pending case.  Fairbank specifically argues that GOPAC should be collaterally estopped from re-litigating the following issues:

> (a) that the Fairbank Guarantee was the operative contract between the parties; (b) that GOPAC violated the Fairbank Guarantee by supplying Fairbank adulterated raw beef trim containing *E. coli* O157:H7; (c) that Fairbank acted as a reasonable buyer within the meaning of UCC § 2-715 when it used GOPAC's contaminated trim without discovering the *E. coli* contamination; and (d) that Fairbank used GOPAC's contaminated raw trim to produce the case ready Shaw's 85/15 products that sickened Ms. Long and Ms. Smith.

(Fairbank Mot. for S.J. (ECF No. 58) at 5.)

Generally, "collateral estoppel bars re-litigation of any issues that were, or could have been, brought in a previous action for which judgment was rendered."  Núnéz Colón v. Toledo Dávila, 648 F.3d 15, 19 (1st Cir. 2011) (citing Barreto–Rosa v. Varona–Mendez, 470 F.3d 42, 45 (1st Cir. 2006)).  "Collateral estoppel may apply as validly to issues of fact as to issues of law."  Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d 1, 2 (1st Cir. 1983).  The mere proffer of "more or better evidence" cannot serve as a basis for denying the use of offensive collateral estoppel when a party has had a chance to litigate and prove an identical issue.  Id.

When Fairbank and GOPAC litigated the preclusive effect of the *Long/Smith* verdict in Precourt v. Fairbank Reconstruction Corp., 856 F. Supp. 2d 327 (D.N.H. 2012), the District of New Hampshire summarized the applicable First Circuit case law on collateral estoppel:

> Collateral estoppel may be applied where (1) the issue sought to be precluded in the later action is the same as that involved in the earlier action; (2) the issue was actually litigated; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was essential to the judgment.

Precourt, 856 F. Supp. 2d at 337 (internal citations and quotations omitted).  In the Court's assessment, this four-part test is satisfied with respect to the following issues:

(1) The Fairbank Guarantee governed the relationship between GOPAC and Fairbank during the relevant time period;[16]

(2) GOPAC delivered adulterated ground beef containing *E. coli* O157:H7 to Fairbank in September 2009; and

(3) Fairbank acted as a reasonable buyer in using the adulterated ground beef by GOPAC in September 2009.

These three issues are raised by Fairbank's pending contractual cross-claims and are identical to the express warranty issues litigated and determined in the *Long/Smith* case. The determination of these three issues was undoubtedly essential to judgment. Therefore, the Court concludes that the prior final verdict and judgment entered as a result of the *Long/Smith* trial and later affirmed by the First Circuit does collaterally estop both parties from re-litigating the listed issues at any future trial on the pending claims. See <u>Precourt</u>, 856 F. Supp. 2d at 337-340 (similarly finding collateral estoppel prevents re-litigation of these three issues following the *Long/Smith* trial).

**B. The Preclusive Effect of the Long & Smith Causation Findings**

Building on the three findings just discussed, the jury in the *Long/Smith* case made two specific causation findings:

1. Adulterated raw beef, which GOPAC delivered to Fairbank in September 2009 and which Fairbank then ground, was later consumed by Long causing her injuries and resulting in her receipt of a settlement of $100,000.

2. Adulterated raw beef, which GOPAC delivered to Fairbank in September 2009 and which Fairbank then ground, was later consumed by Smith causing her injuries and resulting in her receipt of a settlement of $400,000.

---

[16] This issue was decided as a matter of law before trial. See <u>Long v. Fairbank Farms, Inc.</u>, No. 1:09-cv-592, 2011 WL 2516378 at *17-*19 (D. Me. 5/31/2011) (Recommended Decision) & 2011 WL 2669199 (D. Me. 7/7/2011) (affirming Recommended Decision). As a result, the jury was tasked with determining whether GOPAC had breached the Fairbank Guarantee.

(See Special Verdict Form in D. Me. Docket No. 1:09-cv-592-GZS (ECF No. 58-2) (questions 3 &4).)

The pending case does not raise an identical causation question that can be definitively answered by these findings.  Rather, this case poses a unique causation question not posed or answered in the *Long/Smith* case:  Did M.J. consume adulterated beef that Fairbank had ground from GOPAC adulterated raw beef?  Absent evidence suggesting that M.J. ate from the same package of ground beef consumed by Long or Smith, the causation findings from the *Long/Smith* trial do little, if anything, to prove the proximate cause of M.J.'s injuries by a preponderance of the evidence.  Far from establishing a shared dining experience, the undisputed record currently before the Court shows only that Emmie Jones, M.J.'s mother, purchased her family's Shaw's ground beef at a different store and on a different day from either Long or Smith.[17]

Nonetheless, in its written submissions, GOPAC perseverates on how its newly developed evidence undermines the trace-back foundation for the causation findings from the *Long/Smith* case.  These proffers and arguments are a day late and a dollar short.  GOPAC's futile challenges to Fairbank's prior trace-back are premised on issues that were not essential to the *Long/Smith* verdict.  By way of example, the *Long/Smith* verdict does not reflect an essential determination that only ground beef shipped under Fairbank Shipping Invoice 30243 or 30245 contained *E. coli* O157:H7 contamination, nor does it contain an essential determination that all of the implicated ground beef products were produced by Fairbank prior to 1:42 p.m. on September 16, 2013, nor does it reflect an essential determination that only GOPAC 50/50 sirloin trim contained *E. coli* O157:H7 contamination (as compared to GOPAC chuck trim).  The

---

[17] Additionally, although not officially part of the summary judgment record, the more recent filings with the Court suggests that Fairbank now claims that the 85/15 ground beef that caused M.J.'s illness potentially was shipped from Fairbank to Shaw's on September 19, 2009 under an entirely different shipping invoice, Invoice 30247.  (See 3/27/2013 Stevens Letter (ECF No. 95-5) at 6 n.1; Fairbank Reply (ECF No. 64) at 5; GOPAC Sur-Reply (ECF No. 73) at 8).

*Long/Smith* verdict simply does not rest solely on a particular Fairbank Invoice or the use of GOPAC 50/50 sirloin trim.  As the First Circuit noted, there were multiple strains of "strong" circumstantial evidence that supported the causation findings reflected in the *Long/Smith* verdict. See Long, 701 F.3d at 4.

What was conclusively decided by the *Long/Smith* trial and essential to the previous judgment:  GOPAC's breach of the Fairbank Guarantee caused the 2009 *E. coli* O157:H7 injuries of both Long and Smith.  See Pignons, 701 F.2d at 2 (noting that attempts to re-litigate decided matters are barred "[w]hether the holding was right or wrong").  Thus, to the extent that the cause of Long or Smith's O157:H7 infection is relevant to the question of M.J.'s causation, GOPAC is collaterally estopped from arguing or presenting evidence suggesting that Long or Smith did not consume adulterated GOPAC trim or that their illness was caused by some other source of *E. coli* O157:H7.[18]

### C.  GOPAC had a Full and Fair Opportunity to Litigate in the *Long/Smith* case.

GOPAC also opposes Fairbank's request for issue preclusion on the grounds that it was denied a full and fair opportunity to litigate Fairbank's trace-back theory at the *Long/Smith* trial. It is true that a court may decline to apply offensive estoppel upon a finding of unfairness.  See Precourt, 856 F. Supp. 2d at 338-39 (collecting cases).  Upon full consideration of the record in this case and the *Long/Smith* case, the Court finds no unfairness to GOPAC as a result of the preclusion ordered herein.[19]

---

[18] To be clear, unlike the other three issues to which the Court finds collateral estoppel applies, the Court explicitly reserves ruling on whether it would even allow these causation findings to be entered into evidence at a future trial to establish whether GOPAC was the proximate cause of M.J.'s injuries.  See infra note 20.

[19] Even if GOPAC's fairness arguments were deemed valid, it would not provide a basis for denying collateral estoppel on the issues wholly unrelated to trace-back and proximate cause.  These issues include: (1) the applicability of the Fairbank Guarantee, (2) the finding that GOPAC delivered raw beef containing E. coli O157:H7 to Fairbank in September 2009; and (3) the finding that Fairbank acted as a reasonable buyer in using that

In its initial opposition to the pending motion, GOPAC claimed the denial of a full and fair opportunity to litigate resulted from Fairbank's reliance on Shipping Invoice 30243 at trial. GOPAC maintains it came to the *Long/Smith* trial believing Fairbank's trace-back for Long and Smith relied on Shipping Invoice 30236 given the pretrial discovery obtained.  (See GOPAC Response (ECF No. 62) at 7-9.)  This particular argument is without merit.  The Court readily concludes that GOPAC had a full and fair opportunity to litigate Fairbank's trace-back of the Long and Smith ground beef purchases, including the opportunity to cross-examine witnesses who had earlier indicated a reliance on Shipping Invoice 30236 as the invoice under which Fairbank shipped the adulterated ground beef in question.  (See *Long/Smith* Trial Tr. 599-602, 858, 862-64; 869-72; 1358-64 (closing argument); *Long/Smith* Ex. 1211.)  To quote once again from the Precourt decision:  "A party may have a full and fair opportunity to litigate an issue on which it does not prevail. That happens every day, and that is what happened here."  856 F. Supp. 2d at 338.

More recently, GOPAC again reasserted that it was denied a full and fair opportunity to litigate in the *Long/Smith* case because it did not obtain the discovery it has since obtained in the present case.  This argument is also without merit.  The difference between the discovery GOPAC obtained in this case and the discovery it obtained in the *Long/Smith* case reflects hard-fought discovery battles and the strategic choices of GOPAC's counsel.  To be clear, those strategic choices reasonably reflected the sheer number of to-be-resolved legal questions first presented in the *Long/Smith* case.  By comparison, in the context of this case, the legal questions have been refined and winnowed.  As a result, GOPAC's counsel understandably has refocused its efforts on challenging Fairbank's trace-backs and obtaining electronic discovery to further

---

adulterated beef.  Nothing in GOPAC's filings in opposition have provided any basis for denying collateral estoppel in these three identical issues.

that challenge.  Quite simply, this does not amount to a denial of an opportunity to litigate and cannot block the application of collateral estoppel.

### D.  The Cause of M.J.'s *E. coli* O157:H7 is Genuinely Disputed

Ultimately, Fairbank argues that the undisputed factual record related to M.J. combined with the preclusive effect of the *Long/Smith* judgment proves it is entitled to judgment as a matter of law on its contractual cross-claims against GOPAC.  The Court disagrees.

The record presented in this case does not provide an undisputed factual basis upon which this Court can determine that adulterated GOPAC beef was the cause of the injuries for which M.J. seeks damages in this case.  In fact, it is not clear on the undisputed record currently before the Court that M.J. in fact *consumed* Shaw's 85/15 case ready ground beef in the days prior to his illness and that this consumption was his *only* beef exposure.  On this basis alone, Fairbank has failed to establish that it is entitled to summary judgment.

Notably, in <u>Precourt</u>, the district court similarly ruled that Fairbank was not entitled to summary judgment on its crossclaims against GOPAC as a result of collateral estoppel.  <u>See</u> <u>id.</u> at 337.  Rather, the Court concluded that there was not "undisputed evidence linking Black's illness and death to the beef trim GOPAC delivered to Fairbank."  <u>Id.</u>  Likewise, in this case, the factual record linking M.J.'s illness to the adulterated GOPAC combos of beef trim is, at best, genuinely disputed.  As a result, this Court, like the District of New Hampshire in <u>Precourt</u>, cannot grant Fairbank full summary judgment on its contractual indemnity cross-claim.  Having concluded that causation presents a trialworthy question, the parties to the pending case are entitled to have a full opportunity to litigate whether it can be established by a preponderance of the evidence that adulterated GOPAC beef trim was used to make the Shaw's case ready ground

20

beef purchased by Emmie Jones and whether M.J.'s consumption of the same ground beef caused M.J.'s illness and injuries in October 2009.[20]

## V.   CONCLUSION

For reasons just explained, Fairbank's Motion for Summary Judgment is hereby GRANTED IN PART AND DENIED IN PART.  In accordance with Federal Rule of Civil Procedure 56(g), at any future trial on the cross-claims asserted by Fairbank, the following facts and legal conclusions shall be deemed established:

(1) The Fairbank Guarantee governed the relationship between GOPAC and Fairbank during the relevant time period;

(2) GOPAC delivered adulterated ground beef containing *E. coli* O157:H7 to Fairbank in September 2009; and

(3) Fairbank acted as a reasonable buyer in using the adulterated ground beef by GOPAC in September 2009.

As explained herein, if the Court allows presentation of the prior causation findings for Long and Smith, GOPAC will also be collaterally estopped from arguing or presenting evidence suggesting that Long or Smith did not consume adulterated GOPAC trim or that their illness was caused by some other source of *E. coli* O157:H7.

Pursuant to the Court's December 26, 2012 Order (ECF No. 72) approving an amendment to the scheduling order, Plaintiff's disclosure of expert witnesses and reports shall

---

[20] To the extent that any party anticipates that Fairbank will attempt to meet its burden with respect to M.J.'s proximate cause by piggybacking on the prior proximate cause determinations made for Long and Smith, the Court expects that the parties will file a motion in limine in order to allow the Court to determine whether there is a sufficient foundation for such reliance and to what extent evidence to rebut any proffered piggybacked proof would be allowed without running afoul of the collateral estoppel determination made in this Order.

occur no later than 14 days after the docketing of this Order.  Defendants' disclosure shall occur no later than 20 days after Plaintiff's disclosure.

Absent further order of this Court, after the passage of these extended expert report deadlines, the Clerk is directed to place this case on the Court's next available civil trial list, which, absent any extension, shall be the March 2014 Trial List.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 13th day of November, 2013.